IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALLIED NORTH AMERICA INSURANCE BROKERAGE CORP. OF CALIFORNIA,<br><br>Plaintiff,<br><br>v.<br><br>WOODRUFF-SAWYER, a California Corporation<br><br>and<br><br>DERMOD HOUWELING, an individual,<br><br>Defendants. | No. C 04-2527 MJJ<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**; **DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

Before the Court are Defendant Dermod Houweling's ("Houweling") and Defendant Woodruff-Sawyer's ("Woodruff") motions for summary judgment. Plaintiff Allied Insurance Brokerage Corporation of California ("Allied") has also moved for summary judgment on the Third, Fourth, and Tenth Causes of Action of Plaintiff's First Amended Complaint. For the reasons set forth below, the Court **GRANTS IN PART AND DENIES IN PART** Houweling's motion, **GRANTS IN PART AND DENIES IN PART** Woodruff's motion, and **DENIES** Allied's motion.

**BACKGROUND**

This action arises out of Houweling's change of employment from Allied to Woodruff, an insurance brokerage and competitor of Allied's, in June 2004. In 1998, Houweling joined Allied

1  (having come from another brokerage firm, ABD Insurance and Financial Services) as a stockholder
2  and President.  On December 1, 2001, Houweling sold his stock to Allied and one of the company's
3  founders, James Untiedt.  As part of this sale, Houweling and Untiedt entered into the "Stock
4  Purchase Agreement."  In that agreement, Houweling agreed to hold Allied confidential information
5  in a fiduciary capacity for a period of thirty months and not to induce several of Allied's clients to
6  move their business to a competitor during that time.  On the same day, Houweling entered into an
7  employment agreement, the "Producer Agreement," whereby he was to continue his employ with
8  Allied under the new title "Executive Vice President" for a period of five years.[1]  As part of that
9  agreement, Houweling agreed to protect and maintain the confidentiality of Allied's client
10 information and not to "interfere" with Allied's client relationships, that is, in essence, solicit or
11 otherwise induce Allied's clients to break off their relationship with Allied, throughout his
12 employment and for a period of two years following the termination thereof.  He also agreed to
13 return all of Allied's property immediately upon termination of his employment.
14        During his tenure as Executive Vice President, Houweling transferred many electronic files
15 to his home computer, including company contact lists and client files, both via email and utilizing
16 disks supplied by Allied.  Allied alleges that Houweling made these transfers intending to utilize the
17 information contained therein to compete with Allied in future employment.  Houweling stated that
18 he transferred these files to his home computer in order to work from home.  Further, Untiedt
19 testified that this is a common practice at Allied—the company even supplies employees with
20 software to better facilitate the availability of company data for home work—and, specifically, that
21 he was aware that Houweling regularly worked from home, utilizing Allied files, and was free to do
22 so.
23        Some time in late April 2004, Houweling contacted Chuck Shoemaker, Woodruff's
24 Construction Group Practice Leader.  At that time, he indicated that he was considering leaving his

---

[1] Houweling also entered into a "Termination Agreement" which terminated his former position of President and established that the Producer Agreement superceded Houweling's previous employment contract.

2

1  employment with Allied and, though he was not yet prepared to take that step, inquired about
2  Woodruff's business practices. On June 2, Houweling and Shoemaker met for the first time and
3  discussed Houweling's possible move to Woodruff. At that time, Houweling gave Shoemaker
4  copies of the Producer Agreement and Stock Purchase Agreement. It appears from handwritten
5  notes on Woodruff's copies of those agreements that Woodruff was informed of the existence of
6  confidential Allied files on Houweling's computer in conjunction with this meeting. Subsequently
7  they entered into employment negotiations and Woodruff made a written offer to Houweling on June
8  11. On June 13, Houweling entertained, at Allied's expense, four representatives of Allied clients,
9  including two from S.J. Amoroso Construction Co., Inc. ("Amoroso").[2] On June 14, Houweling
10 emailed a list of contacts for several Allied clients including contacts at Amoroso, Gonsalves &
11 Stronck ("G&S"), and Overaa Construction ("Overaa")[3] to John Ward, a Woodruff employee.
12     On June 15 at 8:30 am, Houweling gave written notice of his resignation to Untiedt.
13 Houweling stated that he raised the issue of returning confidential documents to Untiedt at that time
14 and raised it again in the ensuing days without response. Untiedt asserts that he regularly attempted
15 to contact Houweling to discuss the return of these documents without response.
16     Houweling began his employment at Woodruff later in the day on June 15. At 11:30 am,
17 Woodruff sent a general "announcement" of Houweling's move to Woodruff clients, prospects,
18 underwriters, and other professionals including contacts listed in Houweling's June 14 email to John
19 Ward.[4] Houweling later confirmed these contacts with phone calls and a personal visit to G&S's
20 offices. Having received the announcement from Woodruff, both Amoroso and G&S made

---

[2] Allied claims that Houweling told the two Amoroso representatives that he was leaving Allied; however, Allied offers no evidence in support of this allegation. Further, this claim is rebutted by the declaration of Dana McManus (Amoroso principal) who claims in his declaration that he knew nothing of Houweling's plans until after Houweling's resignation on June 15.

[3] Because of the prominent role that these three companies play in this litigation, they will also be referred to collectively as the "Id'd Clients."

[4] Houweling testified that this announcement was planned prior to Houweling's resignation and was the purpose of his June 14 email to John Ward. *Declaration of Gabrielle Wirth in Support in Support of Motion for Preliminary Injunction* ("Wirth Decl.") Ex. A p. 90, Excerpt of Deposition of Dermod Houweling.

3

1 arrangements to move their business to Woodruff that same day. Gerry Overaa, having not yet
2 received Woodruff's announcement, received a phone call from Untiedt who informed him of
3 Houweling's move and made a pitch to retain Overaa's business. After conversations with Untiedt
4 and Houweling, Overaa moved its business to Woodruff on June 21.

5 Although Allied alleges otherwise, the principals of the Id'd Clients, McManus, Stronck, and
6 Overaa, all state in their declarations that they did not know of Houweling's move until after
7 Woodruff sent out the announcement on June 15. Additionally, all stated that they moved their
8 business because of their extensive and positive experiences with Houweling in the past and not
9 because of any solicitation by Houweling or Woodruff.

10 As part of its employment offer, Woodruff instructed Houweling not to use any of Allied's
11 files to service his clients at Woodruff. As a result, Houweling requested information from the Id'd
12 Clients in order to build new files in the first weeks of his employment at Woodruff. Houweling
13 also emailed 14 messages from his home computer to his Woodruff email account, at least some of
14 which related to Allied clients. Allied has also produced evidence that at least some of these
15 documents were originally created before Houweling's resignation. (*See generally* Third
16 Declaration of Andrew Crain in Support of Plaintiff's Motion for Preliminary Injunction (3d Crain
17 Decl.)) Other than three documents allegedly shown exclusively to Shoemaker, none of those
18 documents have been sent beyond Houweling's computer to any other employee at Woodruff.

19 On June 24, 2004, Allied filed its complaint in this action. On July 1, 2004, the Court issued
20 a Temporary Restraining Order ("TRO") that required Houweling and Woodruff to return to Allied
21 all Allied property in their possession.[5] Houweling passed away on November 20, 2004. His estate
22 was substituted in as a defendant on March 24, 2005.

23 On June 21, 2005, Allied filed its First Amended Complaint. Allied initially failed to obtain
24 the stipulation of Houweling or an order from the Court for leave to file an amended complaint.

---

[5]The TRO also prohibited Houweling from servicing the Accounts of Amoroso, G&S, and Overaa. On July 28, 2004, the Court modified the TRO to lift the restriction on Houweling servicing the account of these three clients.

4

1  Allied eventually moved for leave of Court to file the amended complaint, and Defendants opposed
2  the motion.  After hearing oral argument on the motion, the Court denied Allied leave to file the
3  amended complaint.

## LEGAL STANDARD

The summary judgment procedure is a method for promptly disposing of actions.  *See* FED.
R. CIV. PROC. 56.  The judgment sought will be granted if "there is no genuine issue as to any
material fact and [ ] the moving party is entitled to judgment as a matter of law."  FED. R. CIV. PROC.
56(c).  "[A] moving party without the ultimate burden of persuasion at trial [ ] may carry its initial
burden of production by either of two methods.  The moving party may produce evidence negating
an essential element of the nonmoving party's case, or, after suitable discovery, the moving party
may show that the nonmoving party does not have enough evidence of an essential element of its
claim or defense to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co.,
Ltd., v. Fritz Companies*, 210 F.3d 1099, 1102 (9th Cir. 2000).  If the movant meets its burden, the
nonmoving party must come forward with specific facts demonstrating a genuine factual issue for
trial.  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

If the nonmoving party fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party will bear the burden of proof at trial,
"the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S.
317, 323 (1986).  In opposing summary judgment, the nonmoving party may not rest on her
pleadings.  She "must produce at least some 'significant probative evidence tending to support the
complaint.'"  *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.
1987) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

The Court does not make credibility determinations with respect to evidence offered, and is
required to draw all inferences in the light most favorable to the non-moving party.  *See T.W. Elec.*,
809 F.2d at 630-31 (citing *Matsushita*, 475 U.S. at 587 ).  Summary judgment is therefore not
appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary
facts . . . ."  *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324, 1335 (9th Cir. 1980).

**ANALYSIS**

**I.    Computer Fraud and Abuse Act, 18 U.S.C. §§ 1030 et. seq., ("CFAA")**

Allied alleges violations of the CFAA, 18 U.S.C. Sections 1030(a)(4) & (a)(5)(iii). Both sections initially require that the defendant access a protected computer without authorization. *Id.* Once a plaintiff establishes unauthorized access, section 1030(a)(4) requires proof that a defendant accessed that computer with fraudulent intent and in furtherance of a fraudulent scheme. Alternatively, a plaintiff can prove that a defendant caused damage to a computer, 18 U.S.C. § 1030(a)(5)(A)(iii), causing loss to an individual in excess of $5,000 in one year. 18 U.S.C. § 1030(a)(5)(B)(I).

There is no dispute between the parties that Allied's computers are "protected" within the meaning of the statute. The parties do, however, contest the question of authorization. Allied argues that Houweling either exceeded his authority by accessing data bearing no relationship to his work or lost his authority by acquiring interests adverse to Allied. Allied also argues that Houweling acted with fraudulent intent, as that phrase is used in the CFAA context, acquired information valued in excess of $5,000, and that his actions caused a loss to Allied exceeding $5,000.

Defendants argue that Allied has produced no evidence to support its CFAA claim. First, they point out that Houweling was authorized to access Allied's computers and data and that his post-resignation access of Allied files was on his home computer which he also had authorization to access. Defendants also contend that there is no evidence that Houweling was acting at Woodruff's direction between April and June 2004. Additionally, Defendants argue that Allied cannot demonstrate fraudulent intent as required by section 1030(a)(4), and that Houweling did not cause $5,000 worth of damage as required by section 1030(a)(5).

As an initial matter, the Court must decide whether Allied has raised an issue of fact as to whether Houweling exceeded his authority in accessing Allied's computers prior to his resignation

6

and on his own computer after his resignation.[6] It is undisputed that Houweling was authorized to use his home computer and Allied has not alleged that Houweling has accessed Allied computers at any time after his resignation. As a result, Allied's CFAA claims must rest on his use of Allied computers prior to his resignation.

A party exceeds their authority when they access data they are not entitled to obtain or alter. 18 U.S.C. § 1030(e)(6). While Allied argues that Houweling accessed information that he "had no business accessing" because it related to clients with whom Houweling had no relationship and/or related to completed business, the Court disagrees. It is clear from the deposition testimony of Untiedt that Houweling had largely unfettered access to all of Allied's data and was free to transfer files as he wished. The mere fact that Houweling had never sent similar documents home, or the same volume of documents, is simply not enough to raise an inference that Houweling was storing these documents for later use. As a result, Allied has failed to raise an issue of fact regarding whether Houweling exceeded his authority in downloading files for use at home.

Allied has also failed to produce evidence that would tend to establish that Houweling became an agent of Woodruff prior to resigning from Allied. While the undisputed evidence shows that Houweling was investigating a change of employment as early as April 2004, Allied has not produced any evidence to support a finding that Houweling was accessing files during that period in order to compete with Allied on behalf of Woodruff or any other potential employer.[7] *See Coghlan v. American SeaFoods Co. LLC,* 413 F.3d 1090, 1095 (9th Cir. 2005) (stating that when the plaintiff relies on circumstantial evidence, that evidence must be specific and substantial to defeat a motion for summary judgment).

In sum, because Allied has failed to raise a genuine issue of material fact regarding whether

---

[6] Because "the crux of the offense under [the CFAA] . . . is the abuse of a computer to obtain the information," *Shurgard Storage Centers v. Safeguard Self Storage, Inc.*, 119 F. Supp. 2d 1121, 1128 (W.D. Wash. 2000) (quoting S. Rep. No. 104-357, at 3 (1996)), the Court must look for unauthorized access to a protected computer, not to the unauthorized access or use of electronic data.

[7] Just as Allied is unable to establish Houweling's state of mind sufficiently to allow the Court to find that he lost his authority to access Allied's computers, a fortiori, Allied is unable to establish fraudulent intent as required by section 1030(a)(4).

Houweling accessed Allied computers without authorization, the Court **GRANTS** Defendants' motions for summary judgment as to Allied's CFAA claims.

## II.     Breach of Contract

### A.     The Stock Purchase Agreement

Allied alleges material breach of provisions of the Stock Purchase Agreement which was signed on or around December 1, 2001.  In that agreement, Houweling agreed not to induce any of Allied's clients to break off their business relationship with Allied.  He also agreed not to disclose any of Allied's confidential or proprietary information or use such information except for the benefit of Allied for a period of 30 months following the date of the agreement.  As previously discussed, Allied alleges that Houweling transferred client files to his home computer during the restrictive period for the purpose of later using the information against Allied's interests.

By its terms, the 30-month "Restrictive Period" ended May 30, 2004.  Although Houweling appears to have been considering a change in employment prior to the termination of the restrictive period, the undisputed record reflects that Houweling did not begin serious discussions with Woodruff until June 2, after the expiration of the Restrictive Period.  Despite Allied's assertion to the contrary, the Court does not find it reasonable to infer from Houweling's June discussions with Woodruff that Houweling was transferring Allied's data to his home for nefarious purposes during the Restrictive Period ending May 30.  Because Allied offers no competent evidence supporting a finding that Houweling breached his duties under the Stock Purchase Agreement, the Court **GRANTS** Defendant Houweling's motion for summary judgment as to the breach of the Stock Purchase Agreement claim.

### B.     The Producer Agreement

#### 1.     The Non-Compete and Non-Solicitation Provisions/ Misappropriation

The third claim of Allied's First Amended Complaint alleges that Houweling breached the Producer Agreement by soliciting Allied's clients and by misappropriating Allied's confidential and proprietary property.  Allied also alleges a breach of the "Non-Interference" provision of Paragraph 14 of the Producer Agreement, which specifically prohibits Houweling from competing with Allied

8

during his employment and soliciting Allied customers with whom he had dealings during the last year of his employment for a period of two years following the termination thereof.[8]

### a.     Non-Solicitation Provision

As an initial matter, Houweling contends that Allied's breach of contract claim as to the non-solicitation provision fails because the evidence conclusively establishes that Houweling engaged in no solicitation either before or after he resigned from Allied. Allied responds that the mailing list Houweling provided to Woodruff, and the subsequent follow-up phone calls and personal visits, constitute impermissible solicitation using confidential, proprietary or trade secret information.

As the Court previously found in its preliminary injunction order, the non-solicitation agreement may be enforced provided that it seeks to protect confidential and/or proprietary information without requiring proof that such information constitutes a trade secret. The non-solicitation provision of Paragraph 14 appears to protect Allied's confidential and proprietary information as defined by Paragraphs 11, 12, and 13, which includes knowledge of Allied clients Houweling acquired during his employ with Allied.[9] This restriction on solicitation is necessary to protect that information given the difficulty in allowing Houweling to deal with former clients while somehow ensuring sequestration of his proprietary and/or confidential knowledge. As a result, the non-solicitation and non-disclosure provisions of paragraphs 12 and 14 are not voided by section 16600.

Because the Court once again finds the non-solicitation provision of the Producer Agreement valid, the Court must decide whether there is any evidence from which a reasonable inference may

---

[8] As discussed *infra*, the definitions of proprietary and confidential information established by Paragraphs 11 and 13 also play a role in determining the validity of Paragraph 14.

[9] Paragraph 11 establishes that Allied owns all of Houweling's work product produced during his employment with Allied. In Paragraph 12, Houweling agrees not to divulge or appropriate any secret, confidential or proprietary information or knowledge regarding Allied or its clients—including the names and addresses of Allied clients–at any time either during or after his employment with Allied. Paragraph 13 establishes the proprietary and confidential nature of all files, records, customer lists, and other materials either furnished to Houweling by Allied or used by Houweling on Allied's behalf. Thus, Paragraph 12 prohibits the use or disclosure of proprietary and confidential information as defined in Paragraphs 11 and 13, including Houweling's knowledge of Allied clients, as established by Paragraph 12.

1    be drawn that Houweling breached the provision.  While Defendants argue that the Id'd Clients left
2    Allied for Woodruff without being solicited, Defendants' argument ignores the evidence that,
3    whatever reasons the Id'd Clients may have had for moving their business, it is Houweling's
4    solicitous actions, not the motivations of the Id'd Clients, that is relevant to the determination of
5    whether or not Houweling breached Paragraph 14.  Therefore, if Houweling's conduct in connection
6    with the June 15 "announcement" rises to the level of solicitation, he would have breached his
7    contractual obligations.  Allied responds, relying on *American Credit Indemnity Co. v. Sacks*, 213
8    Cal. App. 3d 622 (2d Dist. 1989), to support its contention that the announcement was
9    impermissibly solicitous.[10]  The Court, therefore, must address the parties dispute over the legal
10   significance of this announcement.

11   As the Court previously found in its preliminary injunction order, the fax sent by Woodruff
12   on June 15 appears to be a simple announcement of Houweling's new affiliation and contact
13   information; however, Houweling called the Id'd Clients to ensure that the principals had received
14   the announcement and invited their questions.  During a responsive call from Dana McManus,
15   Houweling specifically discussed Woodruff's qualifications.  Houweling also personally visited
16   G&S on June 15.  Therefore, regardless of the factors that may have contributed to the Id'd Clients'
17   move to Woodruff, Houweling's solicitous actions in connection with the announcement lend
18   credibility to the factual inference that Houweling intended to solicit Allied's customers.[11]
19   Accordingly, Houweling's motion for summary judgment as to the breach of the non-solicitation
20   provision is **DENIED**.

21                  b.    Non-Compete Provision

22   Regarding the non-compete provision, the parties agree that the provision is void unless it

---

[10] In *Sacks*, the court acknowledged the right of individuals and companies to announce new affiliations; however, the court found that where such an announcement goes on to discuss the new employer's services and invites inquiries, that announcement becomes solicitation.  213 Cal. App. 3d at 636-37.

[11] Thus, issues of material fact also exist regarding whether Allied suffered damages as a result of the breach of the non-solicitation provision.

10

1  falls within Business & Profession Code Section 16601, which provides that:

> Any person who sells the goodwill of a business, or any owner of a business entity selling or otherwise disposing of all of his or her ownership interest in the business entity, or any owner of a business entity that sells (a) all or substantially all of its operating assets together with the goodwill of the business entity, (b) all or substantially all of the operating assets of a division or a subsidiary of the business entity together with the goodwill of that division or subsidiary, or (c) all of the ownership interest of any subsidiary, may agree with the buyer to refrain from carrying on a similar business within a specified geographic area in which the business so sold, or that of the business entity, division, or subsidiary has been carried on, so long as the buyer, or any person deriving title to the goodwill or ownership interest from the buyer, carries on a like business therein.

"The thrust of Business and Professions Code § 16601 is to permit the purchaser of a business to protect himself or itself against competition from the seller which competition would have the effect of reducing the value of the property right that was acquired." *Monogram Indus., Inc. v. Sar Indus., Inc.*, 64 Cal. App. 3d 692, 701 (1995).

In an attempt to bring the non-compete provision within the scope of §16601, Allied asserts that the provision was executed in connection with the sale of all of Houweling's stock. Defendants respond that the non-compete provision was located in the Producer Agreement, not the Stock Purchase Agreement, and thus conclude that § 16601 is inapplicable in this case. Both parties move for summary judgment as to this issue.

In California, summary judgment is proper only if the contract or the provision in question is unambiguous. *Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871 (9th Cir. 1979) (interpreting California law). If an ambiguity exists, the Court cannot resolve the dispute on summary judgment. *National Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir. 1983). "The rationale for this proposition is simple: ambiguity in a contract raises a question of intent, which is a fact question precluding summary judgment." *Id.*

The Court finds that Allied's position is expressly contradicted by the language of the Producer Agreement. The Producer Agreement provides that "this agreement constitutes the entire agreement between the parties and supercedes all prior understandings and agreements regarding Producer's employment by Employer." (Producer Agreement at ¶18.7.) The Producer Agreement does not reference the Stock Purchase Agreement or Houweling's sale of stock. Moreover, there is

11

nothing in the Stock Purchase Agreement that states that Houweling will enter into a separate agreement that contains a non-competition agreement. In fact, the Stock Purchase Agreement contained its own restrictive covenants, the subject matter of which was essentially the same as the restrictive covenants found in paragraph 14 of the Producer Agreement. The Stock Purchase Agreement makes clear that the restrictive covenants Houweling agreed to enter into in exchange for the money he was paid for his stock are those set forth in the Stock Purchase Agreement:

> Accordingly, Houweling agrees that the covenants set forth in this Section 6 (collectively, the "Restrictive Covenants") are reasonably necessary to protect the interest of Untiedt in the Shares and that any violation thereof by Houweling would materially diminish the value of the Shares and the goodwill embodied therein.

(Stock Purch. Agmt. ¶6.)

Given these considerations, the Court finds that no triable issues of fact exists with respect to whether the non-compete provision in the Producer Agreement was executed in the connection with the sale of Houweling's stock. Accordingly, Houweling's motion for summary judgment as to breach of the non-compete provision is **GRANTED** and Allied's motion for summary judgment is **DENIED**.

### c. Misappropriation

The Court finds that there is sufficient evidence to demonstrate that Houweling misappropriated Allied information. Paragraph 13 of the Producer Agreement required Houweling to return to Allied, immediately upon his termination or resignation, all property issued to or generated by Houweling during the course of his employ. The parties dispute the extent to which Houweling sought to return these documents. What is clear from the record, however, is that Houweling did not return any of Allied's confidential property until so ordered by the Court. Allied has proffered evidence of files that were in Houweling's possession that he has not yet returned, including files that Houweling was filmed removing from Allied's office late on May 30 and electronic files that Houweling transferred first to his home computer and then to Woodruff's

computers.[12] Allied also notes that Defendants initially denied possession of any floppy disks, only later to acknowledge possession of two, which were subsequently turned over. Further, Shoemaker admits in his declaration "Re: Return of Property" that Woodruff is in possession of electronic files, such as those discussed above, emailed from Houweling's home email account. Accordingly, the Court finds that genuine issues of material fact exist regarding whether Houweling misappropriated Allied property in violation for the Producer Agreement, and Defendant Houweling's motion for summary judgment on this issue is **DENIED**.

### 2. Five-Year Term of the Producer Agreement

The Producer Agreement provides in pertinent part as follows:

> Employer hereby employs Producer and Producer hereby accepts such employment under the terms and conditions hereinafter contained. Subject to the provisions of this Section, Producer's employment shall continue for a term of five years, commencing as of December 1, 2001 and terminating on November 30, 2006 . . . . In addition to any other rights or remedies provided by law and under this Agreement, Employer shall have the right to terminate Producer's employment hereunder for "good cause," effective immediately upon written notice. "Good cause" shall mean the following: i) the loss or suspension of any license required for the performance of Producer's duties; ii) commission by Producer of a felony, whether or not related to the performance of Producer's duties; iii) voluntary termination by Producer of his employment or material breach by Producer of his obligations under this agreement, which breach is not cured to the reasonable satisfaction of Employer within 30 days following written notice to Producer . . . .

(Producer Agreement at ¶1.)

Allied alleges that Houweling breached the Producer Agreement because he was required by its terms to work for Allied for a term of five years. Defendant Houweling asserts that the five-year term in the Producer Agreement was not mutual, and only required that Allied not terminate

---

[12]*See e.g.* Email, from Houweling at Allied to his Comcast email account at home on May 20, 2004. That email was entitled "COC" and contained the attachments COC app. Tracy.doc, GL delivery letter 6.19.03-04, and GL pol notes 6.10.03-04. This email appears to trace to an email from Houweling's Comcast account to his account at Woodruff on June 14, 2004, entitled "FW COC" and attaching the same set of documents. *See also* expensereport.xls emailed as an attachment to Houweling's Comcast account on April 22, 2004, which later appeared as an exhibit to the Shoemaker Decl. Finally, and most clearly, is the list of client contacts emailed on June 14, 2004.

1   Houweling within the five-year period except for specified reasons.[13]  Both parties move for
2   summary judgment on this issue.

3   After considering the arguments of the parties, the Court finds that whether the five-year
4   term in the Producer Agreement was mutually binding on both parties is open to reasonable
5   interpretation.  While the five-year term certainly applies to "Producer's employment," the contract
6   fails to explicitly state whether Allied, Houweling, or both are bound by that term.  Standing alone,
7   the Court would be inclined to interpret the five-year to term to apply to both employer and
8   employee.  However, while the contract clearly states that Allied may only terminate Houweling for
9   "good cause" prior to the end of the five-year term, the contract does not create a similar
10  requirement for Houweling to terminate his employment.[14]  In fact, the contract seems to
11  contemplate that "voluntary termination" by Houweling is acceptable.  To be certain, the "voluntary
12  termination" language creates ambiguity regarding whether Houweling could terminate his
13  employment without cause.  Given the ambiguity in the contract language, the Court cannot resolve
14  this dispute at the summary judgment stage.  Accordingly, Defendant Houweling motion for
15  summary judgment as to the five-year employment term is **DENIED**.  Allied's motion for summary
16  judgment as to this issue is also **DENIED**.

17  **III.    Unfair Competition/ Breach of Fiduciary Duty and Duty of Loyalty**

18  Allied initially seeks to establish unfair competition on the basis of Houweling's alleged use
19  of confidential information.  Allied also alleges that Houweling's contractual breaches and breach of
20  fiduciary duty and duty of loyalty to Allied constitute unfair competition subject to Section 17203.
21  Defendants respond that Allied has not produced sufficient evidence of unfair competition to support

---

[13] While Defendant Houweling also argues that the five-year provision is unconscionable and therefore unenforceable, the Court disagrees.  The California Labor code explicitly contemplates that an employers and employee will enter an employment contract for a "specified term."  *See* Cal. Labor Code §§ 2922, 2925.

[14] Section 2925 provides that "[a]n employment for a specified term may be terminated by the employee at any time in case of any willful or permanent breach of the obligations of his employer to him as an employee."  However, the Court has not found a single case interpreting Section 2925 as setting forth the sole means by which a contract of employment for a specified term may be terminated by the employee.

the claim.

"[A] former employee's use of confidential information obtained from his former employer to compete with his old employer and to solicit business of his former employer's customers, is regarded as unfair competition." *Rigging Int'l Maint. Co. v. Guin*, 128 Cal. App. 3d 594, 606 (1982). The use of electronic, paper, or human intelligence representing Allied's confidential information to solicit Allied customers, therefore, would represent unfair competition. As discussed above, at a minimum, Allied has raised an issue of fact regarding whether Houweling and Woodruff used the contact list emailed on June 14 to solicit Allied customers. Thus, Defendants' motion for summary judgment as to the unfair competition claim is **DENIED**.

The Court also finds that issues of material fact exist regarding whether Houweling breached his fiduciary duty to Allied. Although the explicit fiduciary duty established by the Stock Purchase Agreement expired on May 30, 2004, it appears that Houweling, nonetheless, continued to stand in a fiduciary capacity to Allied until his resignation. *Bancroft-Whitney v. Glen*, 64 Cal. 2d 327, 345 (1996) (holding that officers and directors of corporations are held to "stand in a fiduciary relation to the corporation."); *GAB Business Svc., Inc. v. Lindsey & Newsom Claim Svc., Inc.*, 83 Cal. App. 4th 409, 417 (4th Dist. 1990) (a corporate officer loses his fiduciary capacity only through resignation). Additionally, as noted above, Houweling agreed in Paragraph 12 of the Producer Agreement not to use or disclose to any third party Allied's proprietary information at any time *during or after* his employment with Allied. This additionally appears to establish a fiduciary relationship between Houweling and Allied.

In support of its claim, Allied has produced evidence that Houweling emailed a list of contacts to John Ward on June 14, 2004. This list was sent, pursuant to a pre-existing agreement between Woodruff and Houweling, so that Woodruff could send out a targeted announcement of Houweling's change in affiliation immediately after his resignation. As noted above, this activity appears to have exceeded the confines of a permissible change of affiliation announcement and, therefore, may constitute solicitation. Thus, the evidence suggests that Woodruff entered into an agreement to use contact information sent by Houweling in violation of his fiduciary duties and contractual obligations

15

in order to solicit Allied customers. Accordingly, Defendant Houweling's motion for summary judgment as to the breach of fiduciary duty and duty of loyalty is **DENIED**.

## IV.     Interference with Contractual Relations

A claim for interference with contractual relations requires 1) a valid contract; 2) knowledge of the contract; 3) intentional acts designed to induce breach or disruption of the contract; 4) actual breach or disruption; and 5) resulting damage. *See Silicon Knights, Inc. v. Crystal Dynamics, Inc.*, 983 F. Supp. 1303, 1309 (N.D. Cal. 1997); *Reeves v. Hanlon*, 33 Cal. 4th 1140, 1148 (2004). Both parties move for summary judgment as to this claim.

As an initial matter, the Court finds that Allied has produced significant evidence to support its interference claim. Allied has produced evidence that suggests that Woodruff was aware of Houweling's obligations under the Producer Agreement, including the five-year employment term and the non-solicitation provision. Houweling furnished a copy of this agreement to Woodruff early in their negotiations. Furthermore, the handwritten notes in the margins of that copy strongly suggest that Woodruff was aware of Houweling's contractual obligations. These notes also suggest that Shoemaker was aware of the existence of Allied files on Houweling's computer. With this background, the Court notes again that the evidence suggests that Houweling emailed a list of Allied clients and contacts to Woodruff on June 14 and Woodruff used this list to send out the disputed announcement. Further, this June 14 email was apparently part of a pre-existing agreement between Houweling and Woodruff to make this announcement immediately upon Houweling's resignation. Given these considerations, the Court finds that a issue of fact exists regarding Woodruff's complicity in Houweling's June 14 breach. Accordingly, Woodruff's motion for summary judgment as to this issue is **DENIED**.

However, contrary to Allied's assertion, the evidence does not conclusively establish that Woodruff is liable for inducing Houweling to breach the Producer Agreement. As previously noted, the Court finds that factual questions exist regarding whether Houweling's employment was for a specified term or "at will." If Houweling's employment was "at will," Woodruff would only be liable for intentional interference with contractual relations if it engaged in some "independently

16

wrongful act." *Reeves*, 33 Cal. 4th at 1145. As discussed, while factual questions certainly abound regarding Woodruff's complicity in Houweling's June 14 breach, the evidence produced by Allied has not conclusively established that Woodruff committed an "independently wrongful act" during the process of hiring Houweling. Accordingly, Allied's motion for summary judgment as to its claim of intentional interference with contractual relations is **DENIED**.

## V. Allied's Damages Claim

Woodruff contends that Allied is barred from seeking, under Business and Professions Code Sections 17200 et seq. ("UCL"), restitution of commissions it should have received from clients had Woodruff not cancelled and reissued the policies issued to client by Allied and for commissions on work in progress. In *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003), the California Supreme Court noted that "restitution [under the UCL] is broad enough to allow a plaintiff to recover money or property in which he or she has a vested interest."

Here, Allied has produced evidence that it had already placed insurance on behalf of the clients in question. In fact, Woodruff's own expert agreed that Allied's right to commissions from its clients vested when mid-term Broker of Record letters were sent: "industry practice is that mid-term Broker of Record letters are recognized almost immediately for servicing purposes but commissions remain with the broker of record at inception until such time as the policy is renewed." (Defendant's Expert Report of Donald Way.) Thus, the Court concludes that factual issues exist regarding whether Allied had a vested interest in commissions it was to receive from its clients. Accordingly, Woodruff's motion for summary judgment as to damages under the UCL is **DENIED**.[15]

## CONCLUSION

For the foregoing reasons, Defendant Houweling's motion for summary judgment is **GRANTED** as to the following claims: violation of the CFAA; breach of the non-competition provision; and breach of the Stock Purchase Agreement claim. Houweling's motion for summary judgment is **DENIED** on all other grounds. Defendant Woodruff's motion for summary judgment is

---

[15] The Court also refuses, at this time, to address Allied's ability to recover lost revenue in this case or limit the period of time for which Allied can recover compensatory damages.

17

**GRANTED** as to following claims: violation of the CFAA and breach of the non-competition provision. Woodruff's motion for summary judgment is **DENIED** on all other grounds. Allied's motion for summary judgment is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated: September _25_, 2005



_____
MARTIN J. JENKINS
UNITED STATES DISTRICT JUDGE

**United States District Court**
For the Northern District of California